PEPIN TP. et al. v. SAGE.

(Circuit Court of Appeals, Eighth Circuit. April 14, 1904.)

No. 1,887.

1. MUNICIPAL CORPORATIONS—EFFECT OF DISSOLUTION—LAWS OF MINNESOTA.

Sections 33, 34, ingrafted on article 4 of the Constitution of Minnesota by way of amendment in 1892, prohibit the passage of any local or special law regulating the affairs of, or incorporating, erecting, or changing the lines of, any county, city, village, township, ward, or school district, but provide that the Legislature may repeal any existing special or local law, and that it shall provide general laws for the transaction of any business so prohibited. Gen. St. Minn. 1894, § 258, provides that whenever a law is repealed which repealed a former law the former law shall not thereby be revived unless it is so specially provided. In 1868 a village was created by a special act from territory lying partly within a city and partly within a township previously created. The act creating the village made no reference to the city or township, their boundaries, or the statutes defining them. In 1895 the special act creating the village was repealed. *Held,* that the constitutional and statutory provisions cited had no application to such repealing act; that the statutes creating the city and township and defining their boundaries were not repealed by the act creating the village, the effect of which was to except the territory covered by it from the city and township, and from the operation of the statutes creating them, which exception ended when such act was repealed, leaving the territory within the city and township as before its enactment.

2. SAME.

The express authority for the repeal of any existing special or local law conferred by the proviso to the constitutional amendment is a limitation upon the inhibition against the passage of special or local laws, and withdraws such repealing acts, as well as the changes necessarily wrought in existing conditions, by giving them their ordinary legal effect, from the operation of that inhibition; and hence the act repealing the law creating the village is not to be construed as one changing the boundary lines of the city and township, but merely as releasing the territory previously excepted from their jurisdiction by the act repealed, upon which it again came within their jurisdiction by virtue of the valid and subsisting statutes creating them and defining their boundaries.

3. STATUTES—EFFECT OF REPEAL.

Gen. St. Minn. 1894, § 258, providing that the repeal of a law repealing a former law shall not revive the former law unless so expressly provided, applies only to cases of absolute repeal, and not to cases where the law repealed merely ingrafted an exception on a prior law, leaving it in force. In such cases the repeal leaves the former law to be applied without the exception.

4. MUNICIPAL CORPORATIONS—DISSOLUTION—APPORTIONMENT OF INDEBTEDNESS.

In the absence of constitutional limitation it is wholly within the power of a Legislature on the dissolution of a municipal corporation and the transfer of its territory to others to apportion its indebtedness between such others, and to determine what proportion shall be borne by each; but in the absence of such apportionment they will be severally liable in proportion to the value of the taxable property of the dissolved corporation which falls within their boundaries respectively, and the power of taxation to be exercised to pay such debts will extend to all the taxable property within their respective jurisdictions.

¶ 4. Dissolution and reincorporation of municipal corporations—Effect on indebtedness—see note to City of Uvalde v. Spier, 33 C. C. A. 506.

See Municipal Corporations, vol. 36, Cent. Dig. §§ 107, 109.

5. STATUTES—CONSTITUTIONALITY—SPECIAL LEGISLATION.

Const. Minn. art. 4, § 33, which prohibits the enactment of special laws where a general law can be made applicable, has in numerous decisions been construed by the Supreme Court of the state, which has uniformly held that a law based on a classification purely arbitrary and not justified by some apparent natural reason, was within the prohibition. Act April 10, 1901 (Laws 1901, p. 279, c. 201), provides, in effect, that where a municipality created by special act, and having outstanding bonds or other written obligations, has been or shall be dissolved by the repeal of the act creating it, the effect of which is to attach its territory to one or more existing municipalities, such indebtedness shall be enforceable solely against the territory which was responsible for its payment at the time of the repeal. *Held*, that under the rule of the Supreme Court such act is special legislation, and void, there being no natural reason why a distinction should be made between municipal corporations created by special act and dissolved by its repeal and those created and dissolved under the general laws of the state, which have long existed, and provide both for the creation and dissolution of such corporations; nor between "bonds or other written obligations" and other forms of indebtedness in respect to the property which shall be charged with payment on dissolution.

6. EQUITY—LACHES.

An owner of bonds issued by a village, who commenced an action thereon before the expiration of the period of limitation, and obtained a judgment against the village, which was afterward adjudged in quo warranto proceedings to have been dissolved by a prior act of the Legislature, and who, within two years after obtaining his judgment, and within one year after the judgment of ouster, commenced a new suit in equity against the successors of the village, based on his judgment, was not chargeable with laches.

Appeal from the Circuit Court of the United States for the District of Minnesota.

John E. Stryker (J. F. McGovern, John W. Murdoch, and Michael Marx, on the brief), for appellants.

George H. Selover (Owen Morris, on the brief), for appellee.

Before SANBORN, THAYER, and VAN DEVANTER, Circuit Judges.

VAN DEVANTER, Circuit Judge. This is an appeal from a decree charging the township of Pepin and the city of Wabasha, in the state of Minnesota, as the successors of the late village of Reads, in that state, with the payment of bonds issued by the village during its corporate existence, and apportioning the debt between the succeeding municipalities in the proportion that the taxable value of the property falling within each by reason of the dissolution of the village bears to the taxable value of the entire property within the village at the time of its dissolution. The facts are, briefly, as follows: The village of Reads was created by a special act approved March 5, 1868 (Sp. Laws 1868, p. 261, c. 34), out of territory partly within the township of Pepin and partly within the city of Wabasha. The bonds were issued by that village under authority of special acts approved March 6, 1868 (Sp. Laws 1868, p. 29, c. 16), and March 5, 1869 (Sp. Laws 1869, p. 211, c. 37), by the first of which it is provided that the faith of the village "or the municipal corporation which may succeed it" shall be pledged for the payment of the principal and interest of the bonds, and that to make such payment taxes

shall be levied and collected upon the taxable property of the village in the same manner as other taxes are levied and collected in the village "or the municipal corporation which shall succeed it." Before the actual issuance of the bonds, but after their issuance was authorized by statute and by a vote of the electors of the village, a special act, approved March 5, 1869, again placed in the city of Wabasha the portion of the village which had been taken from the city when the village was created. A special act approved January 29, 1891 (Sp. Laws 1891, p. 551, c. 51), returned to the village the territory originally taken from the city, and from then until its dissolution the village covered the identical territory over which it was first erected. The charter or special law under which the village was created was repealed and the village dissolved by an act approved April 22, 1895 (Laws 1895, p. 798, c. 390), and taking effect February 6, 1896. Acting under the belief, generally shared by all, that this statute did not dissolve or disorganize the village, its inhabitants continued to elect officers, and through them to transact the business of the village and to govern its territory and people as theretofore until in 1899, when in proceedings in the nature of quo warranto prosecuted by the state a judgment of ouster was rendered against the village and those acting as its officers. State ex rel. v. Village of Reads, 76 Minn. 69, 78 N. W. 883. In 1897 appellee commenced an action in the court below against the village to recover the unpaid principal and interest of all of the bonds, excepting one not then due. The action was defended on behalf of the village by the persons claiming to be and acting as its officers, and July 12, 1898, resulted in a judgment for appellee and against the village for the amount due upon the matured bonds. There were seven of the bonds. One matured each year beginning July 1, 1892. The present suit was commenced April 24, 1900. Three questions are presented: (1) Did the territory of the village, upon its dissolution, fall within the township of Pepin and the city of Wabasha, and make them the successors of the village, each to the extent that it received the territory of the village? (2) Is the act of April 10, 1901 (Laws Minn. 1901, p. 279, c. 201), entitled "An act providing a method for the payment of the debts of dissolved municipalities," a valid law under sections 33 and 34 of article 4 of the Constitution of the state, and does it restrict the enforcement of the debt in question to the territory which was responsible for its payment at the time of the dissolution of the village? (3) Is part of appellee's claim barred by laches? It is not questioned that appellee's remedy is in equity.

The present suit strongly resembles and has closely followed the one shown in Mount Pleasant v. Beckwith, 100 U. S. 514, 25 L. Ed. 699, where it was determined, in the absence of constitutional restrictions: (1) The creation, division, and dissolution of municipal corporations, and the powers to be exercised by them, are subject to the legislative control of the state creating them. (2) Where one municipality is legislated out of existence, and its territory is annexed to other municipal corporations, it belongs wholly to the Legislature to apportion between them the debts of the dissolved municipality, and to determine what proportion shall be borne by each; but in the

absence of such legislation the municipal corporations receiving the territory of the one dissolved will be severally liable for its then subsisting legal debts in the proportion that the taxable property within it falls within them respectively, and the power of taxation to be exercised to pay such debts will extend to all the taxable property within their respective jurisdictions, and will not be restricted to the property and persons within the territory annexed. Other cases of similar import are Broughton v. Pensacola, 93 U. S. 266, 23 L. Ed. 896; Meriwether v. Garrett, 102 U. S. 472, 26 L. Ed. 197; Mobile v. Watson, 116 U. S. 289, 6 Sup. Ct. 398, 29 L. Ed. 620; United States ex rel. v. Port of Mobile (C. C.) 12 Fed. 768; Brewis v. Duluth (C. C.) 13 Fed. 334; Laird v. De Soto (C. C.) 22 Fed. 421. The principles announced and applied in Mount Pleasant v. Beckwith are in full accord with the decisions of the Supreme Court of the state of Minnesota, so far as that court has spoken upon the subject. State v. City of Lake City, 25 Minn. 404, 414; City of Winona v. School District, 40 Minn. 13, 16, 41 N. W. 539, 3 L. R. A. 46, 12 Am. St. Rep. 687. Counsel for appellants practically concede that the law is as just stated, and they rely upon certain provisions of the Constitution and statutes of Minnesota as controlling in the present case. Their first contention is that the territory within the village of Reads did not, upon its dissolution, fall within or become part of the township of Pepin and the city of Wabasha, and therefore the township and city are not the successors of the village, and are not charged with the payment of its debts. To support the contention they cite sections 33 and 34, ingrafted upon article 4 of the state Constitution by way of amendment in November, 1892, and section 258, Gen. St. 1894. So far as material, these are as follows:

"Sec. 33. In all cases when a general law can be made applicable no special law shall be enacted; and whether a general law could have been made applicable in any case is hereby declared a judicial question, and as such shall be judicially determined without regard to any legislative assertion on that subject. The Legislature shall pass no local or special law regulating the affairs of, or incorporating, erecting or changing the lines of any county, city, village, township, ward or school district. * * * Provided, however, that the inhibition of local or special laws in this section shall not be construed to prevent the passage of general laws on any of the subjects enumerated. The Legislature may repeal any existing special or local law, but shall not amend, extend or modify any of the same.

"Sec. 34. The Legislature shall provide general laws for the transaction of any business that may be prohibited by section one of this amendment [Sec. 33], and all such laws shall be uniform in their operation throughout the state."

"Sec. 258. Whenever a law is repealed which repealed a former law, the former law shall not thereby be revived, unless it is so specially provided."

We think these provisions are not applicable to the act dissolving the village. Originally the township and city included the territory in question, and the special acts which placed it within the village contain no reference whatever to the township or city, or to their boundary lines, or to the statutes defining them. The statutes creating the township and the city were not at any time repealed, but were left in force. The township and the city were not at any time extinguished, but remained in existence under the operation of those

statutes. The effect of the special acts creating the village and defining its boundaries was to except the territory covered by it from the township and the city and from the operation of the statutes creating them. Subject to that exception, the legislative will, as at all times registered and expressed in living, operative, and valid statutes—not enactments entirely repealed, either expressly or by implication—placed this territory in the township and city. When the special acts which by implication put that exception upon these statutes were repealed, the exception was at an end. These statutes and their definition of the boundaries of the township and city were then operative as if there had been no exception. They did not need to be revived because they had not been repealed. Nor was any amendment, extension, or modification of them necessary to give them effective operation over the territory of the extinguished village. While carefully prohibiting the passage of local or special laws, including those changing the boundary lines of any city, village, or township, the amendment to the Constitution expressly permits the repeal of existing laws of that character, and impliedly, but not less certainly, permits the repeal to have the usual or ordinary effect of such a statute. This repealing act is confined to a direct annulment of the charter or special law creating the village and makes no attempt at any affirmative legislation or to give to the repeal any other than the usual or ordinary effect.

In respect of the constitutional provisions cited, our opinion may be stated in this manner: The express authority for the repeal of "any existing special or local law" is a limitation upon the inhibition against the passage of special or local laws, and withdraws such repealing acts from the operation of that inhibition. The act repealing the charter or law creating the village of Reads is within the express authorization, and is to be given the usual or ordinary legal effect of such an act. The changes wrought in existing conditions by giving this effect to an authorized repealing act are also within the express authorization, and not within the inhibition. Upon the dissolution of the village the territory embraced therein became part of the township of Pepin and the city of Wabasha, not because the repealing act changed the boundary lines of the township or city, but because it released that territory from the excepting effect of the charter or law creating the village; and when this was done that territory came within the boundaries of the township and city as theretofore lawfully defined, by valid statutes still subsisting, and therefore became part of the township and city, and was brought within their jurisdiction. In other words, while this territory was released from the effect of the village charter by the repealing act, it resumed its place in the township and city by reason of the statutes creating them and defining their boundaries. Of course, this result would not have followed if these statutes had been repealed in the meantime, or if the act repealing the village charter had provided—if it could do so without violating the inhibition against special or local laws—that the territory and inhabitants within the limits and jurisdiction of the village should be resolved into the body of the state, and be subjected to its immediate control.

What has been said seems in principle to also dispose of the contention in respect of the effect of section 258, Gen. St. 1894, before quoted, but it may be well to notice the construction uniformly given to similar statutes prescribing a rule for determining the effect of a repealing act. Perhaps the first of the cases is Brown v. Barry, 3 Dall. 365, 1 L. Ed. 638. An act of Virginia adopted in 1792 expressly repealed a prior act. A third act declared that the operation of the repealing statute should be suspended for the time being. In 1789 a statute like section 258 had been adopted, and the contention was that it prevented the repealed statute from being revived by the suspension of the repealing act. The court, speaking through the chief justice, said:

"The act suspending the repealing act of November, 1792, is not within the act of 1789, which declares that the repeal of a repealing act shall not revive the act first repealed. The suspension of an act for a limited time is not a repeal of it; and the act of 1789, being in derogation of the common law, is to be taken strictly."

Smith v. Hoyt, 14 Wis. 273, presented the question in this way: A general statute required the defendant in civil actions to answer in 20 days. An act adopted in 1858 (Laws 1858, p. 134, c. 113) gave the defendant in foreclosure suits six months in which to answer. This was repealed by a still later act. The contention was that the first statute was repealed by the act of 1858 as to foreclosure suits, and that upon the repeal of that act a statute like section 258 prevented the revival of the statute first named. The court held the contention untenable, and, after declaring that the act of 1858 did not strictly repeal the first or general statute but merely excepted a class of cases from its operation, said (page 277):

"That being so, where the statute creating the exception is repealed, the general statute which was in force all the time would then be applicable to all cases according to its terms. And this would be no violation of the rule of construction before referred to, that the repeal of a repealing act should not revive the act repealed. The act of 1858 was equivalent to a proviso attached to the general rule that it should not be applicable to foreclosure defendants. But if a proviso creating an exception to the general terms of a statute should be repealed, courts would be afterwards bound to give effect to it according to those general terms, as though the proviso had never existed. And this could not be said to revive a repealed statute. The rule against this relates to cases of absolute repeal, and not to cases where a statute is left in force, and all that is done in the way of repeal is to except certain cases from its operation. In such cases the statute does not need to be revived, for it remains in force, and the exception being taken away, the statute is afterwards to be applied without the exception."

West Virginia has such a statutory provision respecting the effect of the repeal of a repealing act. In holding it inapplicable to the repealing act then under consideration, it was said by the Supreme Court of Appeals of that state in State v. Mines, 38 W. Va. 125, 131, 18 S. E. 470, 472:

"Now, as I remarked above, section 20 of chapter 35 of the Code was broad and comprehensive, applying every statute of limitation against the state. The act of 1875 [Acts 1875, p. 118, c. 55] only changed or modified it to a certain extent—that is, prevented its operation as to judgments and claims of the state, leaving it in all other respects operative—simply made an exception to the generality of the operation of the statute; and when that act

was itself repealed, and the exception or limitation was no longer in force, said section 20 operates free of that exception. It was only a partial abrogation of section 20. It would have been different, had it been a total abrogation."

Other decisions to the same effect are State v. Sawell, 107 Wis. 300, 83 N. W. 296; Edworthy v. Savings Ass'n, 114 Iowa, 220, 223, 86 N. W. 315; Glaholm v. Barker, L. R. 1 Ch. App. 223; Mount v. Taylor, L. R. 3 C. P. 645. It is clear that, within the meaning of section 258, the statutes creating the township and city and defining their boundaries were not repealed by the charter or law creating the village, and that the repeal of the latter presents no occasion or opportunity to apply the rule stated in that section.

We are of opinion that the territory of the village, upon its dissolution, fell within the township and city, and made them the successors of the village. But it is urged upon us that this results in transferring the debts of one community to other communities which had no voice in the creation of the debts or in their transfer. In one sense that is true, but the result of a ruling to the contrary would be distressing to contemplate. It would amount to a declaration that the state extinguished one of its municipalities under circumstances which make proceedings for the collection and payment of the municipal debts impossible. A result which imputes to a state such an indifference to the claims of justice and to the lawful engagements of the municipalities under its control is not permissible where another is possible under the law. The circumstances of this case do not permit such an imputation. The answer to the present insistence is given in Mount Pleasant v. Beckwith, supra, where the court said (pages 529, 531, 100 U. S., 25 L. Ed. 699):

"But in all these cases, if the extinguished municipality owes outstanding debts, it will be presumed in every such case that the Legislature intended that the liabilities as well as the rights of property of the corporation which thereby ceases to exist shall accompany the territory and property into the jurisdiction to which the territory is annexed. * * * Power exists here in the Legislature not only to fix the boundaries of such a municipality when incorporated, but to enlarge or diminish the same subsequently, without the consent of the residents, by annexation or set-off, unless restrained by the Constitution, even against the remonstrance of every property holder and voter within the limits of the original municipality. Property set off or annexed may be benefited or burdened by the change, and the liability of the residents to taxation may be increased or diminished; but the question in every case is entirely within the control of the Legislature, and, if no provision is made, every one must submit to the will of the state, as expressed through the legislative department. Inconvenience will be suffered by some, while others will be greatly benefited in that regard by the change. Nor is it any objection to the exercise of the power that the property annexed or set off will be subjected to increased taxation, or that the town from which it is taken or to which it is annexed will be benefited or prejudiced, unless the Constitution prohibits the change, since it is a matter, in the absence of constitutional restriction, which belongs wholly to the Legislature to determine."

April 10, 1901, the Legislature of the state enacted a statute entitled "an act providing a method for the payment of the debts of dissolved municipalities (Laws 1901, p. 279, c. 201)" which is as follows:

"Section 1. That in all cases in which the Legislature of the state of Minnesota has repealed, or may hereafter repeal the charter of any city, village, borough, or other municipality, or the special law under which the same is,

or was, organized, or created, against which municipality there are outstanding bonds or other written obligations which are, at the time of such repeal, a legal and enforceable claim against the municipality affected by such repeal, without making, or having made, any provision for the payment of such indebtedness, and the effect of such repeal is to attach the territory of the municipality so dissolved to one or more municipalities existing at the time of such repeal, said indebtedness shall be and continue to be enforceable solely against the territory which was responsible for the payment of the same at the time of said repeal, and it shall be the duties of the proper officers of the municipality, or municipalities, which acquire the territory of the dissolved municipality, to levy such tax or taxes upon the property and territory coming within its or their jurisdiction, by reason of such repeal for the payment or discharge of such outstanding indebtedness, and to collect, receive and apply the same in such payment of such indebtedness in practically the same manner as would have been the duty of the proper officers of the dissolved municipality to levy taxes for the payment of said indebtedness, and to collect, receive and disburse the same, had there been no repeal of said charter or special law. And the territory so attached to such municipality or municipalities shall not be liable for any of the debts of such municipality or municipalities existing at the time of the repeal of said charter or special law, but all such debts shall continue a demand solely against the municipality or territory which was liable for the payment of the same at the time of said repeal.

"Sec. 2. This act shall apply to all cases falling within its provisions in which judgment has not already been recovered by the owner or holder of such bonds, or other forms of indebtedness as are described in section one of this act, against the municipality or municipalities acquiring the territory of the dissolved municipality."

The second contention of counsel for appellants rests upon this act, and is that the enforcement of the debt in question should be restricted to the territory which was responsible for its payment at the time of the dissolution of the village, and that the decree against the succeeding municipalities should be limited to requiring "the assessment, levy and collection of a tax upon the property situate within the boundaries of the dissolved municipality for the purpose of paying the amount which appellee is entitled to recover." Counsel for appellee challenge the validity of this act under the provisions of sections 33 and 34 of article 4 of the state Constitution, before quoted. The claim is that it is not a general law, and does not have uniform operation throughout the state. This act has not been considered by the Supreme Court of the state, but the principles by which its validity is to be tested are well settled by the decisions of that court, among which are Nichols v. Walter, 37 Minn. 264, 33 N. W. 800; State ex rel. v. Cooley, 56 Minn. 540, 58 N. W. 150; State ex rel. v. Ritt, 76 Minn. 531, 79 N. W. 535; Murray v. Commissioners, 81 Minn. 359, 84 N. W. 103, 51 L. R. A. 828, 83 Am. St. Rep. 379; Duluth Banking Co. v. Koon, 81 Minn. 486, 84 N. W. 335; Hetland v. Commissioners (Minn.) 95 N. W. 305; State ex rel. v. Justice (Minn.) 97 N. W. 124; Thomas v. St. Cloud (Minn.) 97 N. W. 125. In Nichols v. Walter, an act regulating the removal of county seats was held not general, or of uniform operation, because the terms of the act were such that in any county which had located its county seat by a vote of its electors at any time before the passage of the act removal could be effected only by a vote of three-fifths of the electors, while in other counties removal could be had upon a majority vote. The court was of opinion that the basis of the classification was arbitrary, and that the

application of different rules to the two classes of counties was not grounded in necessity or propriety. Referring to the constitutional limitation, it was said (page 271, 37 Minn., page 802, 33 N. W.):

"A law is general and uniform in its operation which operates equally upon all the subjects within the class of subjects for which the rule is adopted; but, as we have said, the Legislature cannot adopt a mere arbitrary classification, even though the law be made to operate equally upon each subject of each of the classes adopted. An illustration and example of that we take from State v. Hammer, 42 N. J. Law, 435, 440: 'Thus a law enacting that in every city in the state in which there are ten churches there should be three commissioners of the water department, with certain prescribed duties,' would present a specimen of such a law. So in the matter we have supposed, of granting powers and privileges to incorporated villages, if those situated on rivers were placed in a class for the purpose of conferring on them special powers and privileges not referring to nor suggested by the peculiarity of their situation—as, for instance, for the purpose of maintaining high schools—the classification would be merely arbitrary. The principle adopted by the Supreme Court of New Jersey comes more nearly to what we regard the true principle of classification than that stated by any other court. We quote again from State v. Hammer: 'But the true principle requires something more than mere designation by such characteristics as will serve to classify, for the characteristics which thus serve as the basis for classification must be of such a nature as to mark the objects so designated as peculiarly requiring exclusive legislature. There must be a substantial distinction, having reference to the subject-matter of the proposed legislation, between the objects or places embraced in such legislation and the objects or places excluded. The marks of distinction on which the classification is founded must be such, in the nature of things, as will, in some reasonable degree at least, account for or justify the restriction of the legislation.' Or, to state it differently, though not so well, the true practical limitation of the legislative power to classify is that the classification shall be upon some apparent natural reason—some reason suggested by necessity, by such a difference in the situation and circumstances of the subjects placed in different classes as suggests the necessity or propriety of different legislation with respect to them."

In State ex rel. v. Cooley, the court declared its adherence to what had been stated in Nichols v. Walter, and then said (page 551, 56 Minn., page 153, 58 N. W.):

"By 'necessity' is meant 'practical,' and not 'absolute,' necessity. But the characteristics which will serve as a basis of classification must be substantial, and not slight or illusory. For example, distinctions due merely to pre-existing repealable special legislation would not, of themselves, constitute a proper basis of classification, for that would tend to perpetuate the very peculiarities which the Constitution was designed ultimately to remove."

In State ex rel. v. Ritt, an act was likewise held not general or of uniform operation which provided for one assessor for the entire county in each county of not less than 100,000 and not over 185,000 inhabitants, and left in force in all counties of less than 100,000 or over 185,000 inhabitants the existing law providing for an assessor for each township, city, and village. In support of the act it was contended that there was necessity or propriety in having the property in very populous counties assessed by or under the supervision of one officer as a means of attaining greater uniformity in valuation. Without acceding to the contention, the court said (page 535, 76 Minn., page 536, 79 N. W.):

"But, the more populous the county, the stronger this reason would apply. If it applies to counties whose population is between 100,000 and 185,000, it applies with still greater force to counties containing more than 185,000.

There is no apparent reason suggested by necessity, or by the difference in the situation or circumstances of counties having a population of not less than 100,000 and not over 185,000 and counties having a population of over 185,000, why the county assessor system should be applied to the former, and the latter left under the local assessor system in the same class with counties having a population of less than 100,000. The attempted classification is therefore arbitrary and incomplete, for the reason that it does not include all the members of the same class, but excludes some whose conditions and wants render such legislation equally necessary and appropriate to them as a part of the same class."

In Murray v. Commissioners an act was likewise declared invalid which provided for the treatment, at the expense of the county of their residence, of a limited number of indigent habitual drunkards in counties having a population of 50,000 or more. The court, after observing that drunkenness was not confined to counties having more than 50,000 population, based its decision upon a statement that a classification cannot be sustained unless it embraces all, and excludes none, whose condition and wants render the legislation necessary or appropriate to them as a class, and that, to be valid, legislation limited in its relation to particular subdivisions of the state must rest on some characteristic or peculiarity plainly distinguishing the places included from those excluded. Hetland v. Commissioners involved an act which authorized the issuance of bonds to provide money to complete courthouses in counties having a population of 100,000 or less, which had entered into a contract for the erection of a courthouse, and had expended $7,000 or more towards its erection. The act was held invalid as establishing an unwarranted classification, and as being general in form, but special in operation. State ex rel. v. Justus presented the question of the validity of an act requiring journeymen plumbers to take an examination and procure a certificate of competency as a condition to their employment in cities or towns having a system of sewer or water works. The court was of opinion that faulty plumbing was injurious and pernicious whether done by a journeyman plumber or by a master plumber, and whether done in a city or town without a system of sewer or water works, or in a city or town where such a system exists. The act was declared invalid as making an arbitrary and unreasonable distinction in the places and persons to which it applied. Thomas v. St. Cloud involved an act authorizing the issuance of bonds with which to purchase waterworks in cities which have owned waterworks and have sold them with a reserved right to repurchase them. The act was adjudged special and invalid, because "the basis of the classification used is so narrow, restricted, and peculiar that the inference is unavoidable that it was not intended as a general law, but to meet the requirements of a special situation."

By its terms the act under consideration makes the presence of the following conditions requisite to its operation: (1) The indebtedness must be that of a municipality organized or created under a charter or special law. (2) The dissolution of the municipality must have occurred through the direct legislative repeal of such charter or special law. (3) The indebtedness must be outstanding bonds or other written obligations. (4) The effect of the repeal must have been to attach the territory of the municipality so dissolved to one or more mu-

nicipalities existing at the time. In Minnesota there has long existed a system of general laws providing for the creation, division, and dissolution of villages and other municipal corporations, and for detaching territory therefrom and attaching territory thereto. Municipalities existing under these general laws incur debts substantially in the same way and for the same purposes as do those existing under special laws. Both classes contract debts by implication as well as through bonds or other written obligations, and both may incur liabilities through tortious acts of their officers and servants. The engagements and liabilities of both classes stand upon the same footing, and the creditors of both are entitled to the same consideration. Both classes are subject to dissolution, and the necessity or propriety of providing for the payment of their debts in that event is the same whether the municipality owes its existence to a special law or to the general laws, and whether it be dissolved by direct act of the Legislature or by the action of its inhabitants had under the general laws. Nothing in the special or general character of the laws by or under which municipalities are created or dissolved suggests that it should be made the basis of a distinction or difference in those who succeed to the obligation to pay the debts of dissolved municipalities, or in the property from which the money to pay these debts shall be raised by taxation or in the character of the debts to be paid, whether evidenced by written obligations or otherwise. The subject is one which in its nature, and with justice to all concerned, can be reasonably covered by a general law operating uniformly in all cases. To make the repealable special charters of municipalities owing their existence to that character of legislation the basis of a classification, when no necessity or reason for a difference in remedies, liability, or legislative treatment inheres in that fact, is special legislation. A statute establishing such a classification does not include all objects which, in their nature, are of the same class, but excludes some whose conditions and wants render such legislation equally necessary and appropriate to them as members of the class.

Tested by the rules announced and applied by the Supreme Court of the state, the act of April 10, 1901, is violative of the constitutional restriction upon special legislation, and is void. It may, as is asserted by counsel, propose an equitable and just plan of adjusting and discharging the debts of the dissolved municipality or municipalities to which it applies, but this does not satisfy the imperative constitutional requirement that, to be valid, the act proposing and establishing the plan must not be special, but general, and of uniform operation throughout the state. Wanting in this essential, it falls within the inhibition against special legislation, no matter what its merits in other respects. It is of significance that the act declares that it shall apply to cases in court falling within its provisions which, at the time of its passage had not proceeded to judgment. The present suit was commenced April 24, 1900, and had not passed to a decree when the act was passed, April 10, 1901. There is no claim that any other suit of this character was then pending, or even contemplated. The conditions existing at the time and the terms of the act make the inference unavoidable that it was not intended to be a general law of uni-

form operation, but to meet the supposed requirements of a particular situation. The act is clearly void, and does not affect the rights, remedies, or liabilities of any one.

We think the contention that part of appellee's claim is barred by laches is without merit. The period of limitation within which actions could be commenced upon the village bonds is fixed at six years by the state statute. As to one bond, that period expired July 1, 1898, as to another, it expired July 1, 1899, and as to the others, it had not expired when the present suit was commenced. Appellee's action at law against the village, upon the two bonds with others, was commenced before the expiration of the period of limitation, and was prosecuted to a judgment in his favor before the judgment of ouster in the proceeding in quo warranto; and the present suit, which is rested in part upon the judgment in the action at law, was commenced within less than one year after the dissolution of the village had been so judicially pronounced. The record does not disclose such delay on the part of appellee as requires or permits the application of the doctrine of laches.

The decree is affirmed.